162173 Brittany Irish Gall v. State of Maine David Bender for the state of Calgary police head office. Essentially the point of this appeal is that the underlying trial force should not have dismissed that mistake and made the allege that my clients have a violent civil rights claim for failure to protect them. I think the facts are clear that the extreme end of what may be the case. Counsel, nobody cited to this court a decision I wrote in Soto v. Flores. Did you ever look at that case? It's a 1997 case. It is actually on facts that are in some ways much worse than these facts and holds that the Supreme Court should not have dismissed that mistake and made the allege that my clients have a violent civil rights claim for failure to protect them. There was a police officer who told the husband that the wife had complained about him despite the warning that he might, he had said, I'll harm someone if you go to the police. And they told him that as well. And he killed their children. And nonetheless we found there was qualified immunity. And there's been no intervening Supreme Court case law that would reverse that case. That is correct. There has been a move in various circuits toward a four-part test for what is called safety of danger, which this court has acknowledged in Cronin v. Cronin, but has never found applicable to a set of facts. And under, we would assert that under that four-part test that the 2nd, 3rd, 5th, and 9th circuits have adopted, that this case would clearly fall within the prerogative of that test. Clearly you have an immediate and obvious apparel. You have an officer, a series of officers who disregard that apparel. Excuse me. One difference between your case and some of the others is that the police expressly told her two things. One, that they couldn't give protection. And two, that they, assuming she wanted to go forward with the complaint, which she did not withdraw, that they were going to have to let him know. That there was a complaint against him by her. So how is it that the state created the danger when the state makes those representations to her, a sort of anti-promise? Well, there's really two sets of state activities here that are of concern. The first is at the initial stage when she reports the final date of abduction of July 14, and the Bangor Police Department, the state police, and they say, we believe we have to present this allegation to Mr. Lord and give him an opportunity to give his side of the story. In response to that, Brittany Ivers says, please do not do that. There are alternatives. He will fall into a rage and be very violent and engaged if you do that. She offered one alternative, which would be, for her example, to go to him either in a monitor kind of way or otherwise. But there's other things the police could have done. The police could have gone to him in person rather than in a voicemail, for example. Why would that have made any difference? You don't allege any of this, nor do you allege why that would be important. Weren't they looking for him because of the dumpster fire anyway? Well, they were looking for him because of a fire after the fact. The fire followed the initial complaint by Brittany Ivers of the rape. They then make a phone call to Mr. Lord and leave a message of the rape allegation. She has said, I will meet with him. I will solicit a confession. You can monitor it. You can have people protect me or whatever. There's other alternatives they could have followed. From that point forward, almost immediately, within two hours of that representation and that voice message, the barn, the unoccupied barn, which is over Sour in Benedicta, catches on fire. It's about 108 miles away. Her mother with MS is there. Her father is there. She decides to go up there and be with her parents. At that point, when she's actually with the state police in Benedicta, Maine, up in Earth County, the phone call comes in from the brother who says, I'm sitting in a bar with a friend of Anthony Lord's. He's infuriated by the fact that this allegation was made and the voice message received in the state police. Someone's going to die tonight. I'm going to kill someone tonight. That's actually after the, and then the second event is at that point, the second event is where she says, I'm here in a very rural area. They knew he was in the vicinity. Can we go back to the first moment of the contact? Are you alleging that she, or do you agree you don't allege that she didn't say don't notify when she was told how he would be notified? Yes. She said, do not. I'm trying to follow the complaint. Okay. As I read the complaint, she proposes a way of notifying him. They say, we don't do it that way. Then this is just your complaint. Then, then she says, then they say, here's how we are going to do it. And then, and they know that she has said that's a very dangerous way to do it. But as I read the complaint, there's no allegation that she said, well, if that's how you're going to do it, don't do it. Am I right about that or not? No, she says, I will meet with him. I know him. They say, we don't do it that way. They say, here's how we're going to do it. Correct. Does she say at that point, do you allege, she says at that point, don't do that then? Yeah. Do not, he will go and he will fly into a rage. Where is it in your complaint? Where she says do not do that? Yeah. She says he will fly into a rage if they do that. Right. You're saying that that's implicitly, I mean, it can be that that's your argument, but you're saying implicitly that's a statement to them they should have known not to do it then? Yeah. At paragraph 26 of the complaint, she says, Brittany Irish advised the police officers that she was afraid that that, meaning the notify Mr. Blore, quote, who would incite, quote, a terrible violence and that she would not, thereupon, be safe, end quote. Okay. Are you saying that comes after she's suggested her alternative or before she suggested her alternative? In the same conversation. She says, I will meet with him and I, before they make the voicemail call to him. So the conversation is basically, they want to go that way. She says, please don't do that. It will incite terrible violence that would not be safe. And then she suggests I can meet with him and wear a wire and be surveilled and be made safe. I don't know if it matters, but I had read your complaint to have the opposite sequence. You know, you may be correct. It was the same conversation. And in any event, it was all before the voicemail was made. Okay. So you say there are two important time periods and you were beginning to get into the second time period. So do you want to go back to that? She goes there. She meets with the state police at the home of her parents in Benedicta. Again, it's a very rural setting, woods surrounding it. Everyone suspects that the Lord was in the woods watching. And while she is meeting with the state police in Benedicta, a phone call comes in from the brother of Brittany who says, the best friend or a good close friend of Anthony Lord is at a bar. He received the voice message from the state police, and he's furious about it. And someone's going to die tonight. He said he's going to kill someone tonight. And that's when the state police are in Benedicta, which is about an hour and 15 minutes north of Bangor. They've all traveled from Bangor up the rest of the county. And they're in this little house with a couple of police cruisers. For all you know, Anthony Lord is sitting outside in the woods watching. And at some point, the police cruisers pull away, leaving the Brittany Irish family like a sitting duck. And then at 2 o'clock in the morning, he comes in, kills one, shoots the other, and that's Brittany. So that's the second event is when... Are you saying that when she gets that call, she then tells the police about that call, and that they do something to promise that they will, in fact, prevent that from happening? Because you don't say that in a complaint. She does not. There is no promise. They say they cannot protect her. And then the mother says, can you at least leave a police car to give an image? And they say no. So the affirmative act that you identify that the police engaged in that creates the danger is the leaving of her name and those allegations on his voicemail, knowing that she had said, if you do that, I'll be in great danger. Correct? Correct. And then the rest of it is all adds to some argument about the callousness of how the government responded to the danger they had created. The obviousness and immediacy of the peril that was created and the ability to protect her in light of the obvious and immediate peril. That's correct. Okay. Thank you. Thank you very much. We'll hear from your opponent, Mr. Taube. Please support him, Ms. Taube. We've seen you several times these last months. Yes, I've been very lucky to be down here a few times. I'd like to start with an apology. We did cite the Soto v. Flores case, but we clearly didn't give it the discussion that it probably should have received. All right. Just respond to his arguments. Yeah, and so there are really only two exceptions to the general rule that the state can't be held responsible for harm by a private person. One, if there's some kind of special relationship, and I think that's a claim that was made early on, but I think it's been waived. There's this idea about a promise being made, but as the court pointed out, in fact, here there was a disclaimer of a promise. The police said, no, we can't even spare a car to protect you. So what we're left with is the state-created danger, which does require an affirmative act. And the affirmative act here that's alleged in the complaint, the only affirmative act, is contacting the alleged perpetrator after the alleged victim. You put it in that kind of abstract way. Yes. But the affirmative act is calling him up and leaving the name and the allegations on the cell phone at the very outset of the investigation before anything else has been done. So there's no prospect he could be arrested and put in custody or anything at that point. And the question is, does that action, the way it was done, not the fact of contacting, but the way it was done, was it so grossly out of kilter with how normal procedures should have applied that it itself appreciably contributed to the danger she faced? We would say no. Do we have anything either way in the record that would help us? But so at a 12 v. 6, we're not at summary judgment. Just hearing it, it doesn't – is that ordinary practice that you – somebody calls them and says, I'm really worried about somebody? Okay, I'll call them and leave on the cell phone that you've made this accusation? I mean, even after they say, you know, if you do that, I'm in grave danger? It doesn't seem like standard practice. Well, what we have here is a victim coming forward and saying that this person committed a crime against me. And the police said, well, what we do then is we contact the person that you're making the accusation against. And the victim urged the police not to do that when they said they were going to do it anyway. This is kind of a response to your question earlier. She didn't say, well, then never mind. I don't want to go forward with a complaint. They knew what – she knew what the police were going to do. And I would submit that the court could take judicial notice that trying to interview a suspect who's been accused of a crime is standard police practice. And so what we would say is that Rivera really controls this case here because they identified – This is all a little bald. Are they saying we are trying to arrange an appointment with you, call us back, because this accusation has been made against you? Is that the purpose of the call? I'm just looking at the complaint, and I don't remember if it's alleged here, but my recollection is they contacted him to set up a meeting. We're trying to get in touch with you. Can you give us a call? That's not what the allegation in the complaint says. The allegation in the complaint is that Brittany Irish has accused you of the following crimes. I don't disagree with that. Well, is that – that's different than saying, hi, we're trying to get in touch with you. Well, I think they said this is why we're trying to get in touch with you. I mean, there's no allegation. They didn't even say – I mean, you typically give the name of the accuser and leave that on the voicemail? Well, I think in a case like this where it's a one-on-one kind of crime, it's an alleged assault or a rape, I don't know how else they're going to do it. Well, you can show up at the – Yeah, you can show up. I guess two points here. First is that – is that there's certainly nothing on the complaint to suggest that this was an uncommon practice. And I don't know that the court wants to get into the business of second-guessing how the police do an investigation. But I think the more important point here is that we also have a qualified immunity defense. And any officer – any officer who reads DeShaney and then reads Rivera is going to come away understanding that it's not a clearly established violation of Ms. Irish's due process rights to leave a voicemail message with the alleged perpetrator saying that she's made these accusations. Even if that was after discovery, we determined – or the fact finder determined, was it actually well outside the bounds of standard operating procedure for the police? Well, there's nothing in the complaint – I understand. That was not my question. Well, but again, I mean – Why would an officer – I'm sorry. Why would an officer understand? It's supposed that the – and I just don't – this is a question I'm not sure what you have to allege at the 12B6 stage. They allege the fact. The fact on its face, to me, seems surprising that this would be the way you would perceive. If after discovery it turned out that that, in fact, is against standard operating procedure, and grossly so, would it still be the case that any officer would know that they could do this and it wouldn't be a problem? Well, two responses. First, it's clear that we're entitled to disposition at the earliest possible stage. And certainly there's been no discovery. But if the plaintiff had any evidence to suggest that this was not standard procedure – In fact, the complaint says that the cops said, this is the way we do it. This is what we're going to do here. So there's certainly nothing in the complaint, even an allegation that this was outside of standard procedure. But even if it was, again, there's no case from this jurisdiction, from the Supreme Court – The Ninth Circuit has a very similar case. The Kennedy case. I'm sorry, Your Honor, I'm not – And is that one of the things they talk about, whether it was standard operating procedure to go notify the perpetrator and say, hey, the victim's making this accusation against you? And in there, there was testimony in which the cops say that. Well, actually, normally we don't do it that way. We usually wait until the end of the investigation before we would confront them with a direct allegation. And again, our response is there's not an allegation in the complaint. The allegation in the complaint that was just the act itself was this affirmative act that gives rise to the state-created danger. There's no allegation in the complaint that this was not a routine police practice, that this was somehow an unusual step that the police took. In fact, the allegation is the contrary, that she was told this was the standard practice. But, you know, I decided – I wrote a case, I think Judge Thompson was with me, called Stamps v. City of Framingham, in which we denied immunity to an officer who violated three or four different police protocols in holding a rifle to the head of a prone person. I'm sure you've read the case. And in that case, the question of police procedure, what was normal, what was well-accepted practice, proved to be very important on our qualified immunity decision. So this sort of comes down to, well, you moved to dismiss. You could have put a few more facts into the record. You chose not to. They chose not to. And we're left in this position. Well, in my response to that, Your Honor, if I'm thinking of the right case, this was a case arising out of Puerto Rico where there was this training exercise. No, that's an entirely different case. Then I have the wrong case in mind. But I would point out, in the training exercise case, the plaintiffs are alleged that this was outside of normal procedure. They said that the normal procedure is to use only dummy weapons. The normal procedure is to not have a loaded firearm in the building. The plaintiff has not made any allegations here that this is outside the course of normal procedure. How possible would it be for the plaintiff to know what the normal procedure would be at this stage? Certainly the plaintiff can do a Freedom of Access request and get information. Yeah, a public records request. Yes. But again... It just seems very odd that the victim was put in a Catch-22 situation. Either she went forward risking her life or she could get no justice for what she alleged was done to her because the police say that we don't do it that way. Well, so, and I want to say this carefully because I don't want to make this sound like I'm blaming a victim here. Because I'm not. But the fact of the matter is, when you come forward and accuse someone of a crime, inevitably there's going to be some danger to yourself. And I think the court in Rivera recognized that. And the question is, that sounds exactly right after Rivera, but the question is, is there a circumstance in which the way the government responds to the complaint so appreciably increases the level of danger that one should ordinarily expect to be in if you make an accusation, that it becomes actionable. And on its face, the facts are disturbing, to me at least. Well, so, I mean, first, John, in order to overcome qualified immunity, there's got to be some case out there that should have put the police on notice that what they were doing here was wrong. And we would submit there's not one. But the other point I'd like to make is, if I didn't finish this thought, is what Ms. Irish wanted the police to do was, I think, to set up a meeting with her and Mr. Lorimer. She was wearing a wire. I would suggest that if the police had actually gone through with that, and something had gone wrong, that's a much better case for a state-created. I don't think that case necessarily would state a state-created danger case. But that is something when the police are doing something unusual. I mean, they're setting up this operation where they're putting the victim right in close proximity with the alleged perpetrator. And we would submit that maybe this could have been handled differently, but we would submit that calling up the accuser and saying, a person's made an allegation against you, this is the person who's made the allegation, and we want to talk to you, we would say that doesn't violate any clearly established due process rights. Okay. Thank you.